**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANTONIO LEONARD TNT PRODUCTIONS, LLC, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-13-3486 |
| GOOSSEN-TUTOR PROMOTIONS, LLC, AND DAN GOOSSEN, | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

Antonio Leonard TNT Productions, LLC ("Leonard Productions") sued Goossen-Tutor Promotions, LLC ("GTP") and its president, Dan Goossen, in Texas state court, alleging that the defendants had breached a partnership agreement with Leonard Productions to copromote certain boxers. (Docket Entry Nos. 1, Ex. 4; 12). The defendants timely removed to federal court and moved to dismiss based on a lack of personal jurisdiction and issue preclusion. They also moved to compel Leonard Productions to arbitrate its claims.[1] (Docket Entry Nos. 5, 19).

Based on the briefs, the pleadings, the parties' submissions, and the applicable law, this court denies the motion to dismiss for lack of personal jurisdiction, denies the motion to apply issue preclusion, and grants the motion to compel arbitration. (*Id.*). The motion for a preliminary injunction, (Docket Entry No. 3), the motion for a protective order, (Docket Entry No. 35, amended

---

[1] The defendants also asked this court to abate or dismiss on the basis of *forum non conveniens* because GTP had filed another lawsuit raising similar issues in a California state court. That suit has been dismissed, making the motion to abate or dismiss on this ground moot.

as Nos. 37 and 41), and the motion to compel production, (Docket Entry No. 42), are denied as moot.

No later than **September 26, 2014**, the parties are to file a statement identifying reasons this case should not be dismissed with prejudice (as opposed to stayed) in favor of arbitration.

I.    **Background**

Leonard Productions, Goossen, and GTP are in the business of boxing promotion.  GTP is incorporated and located in California.  Its president, Goossen, is a California citizen.  GTP is registered with the California State Athletic Commission (CSAC), a state entity that regulates boxing matches.  Leonard Productions is a Texas limited liability corporation.  Its president and sole member is Antonio Leonard, a Texas citizen.  (Docket Entry No. 1 at 3).

In 2004, GTP and Square Ring, Inc. entered into a Promotional Agreement with Andre Ward, a successful boxer.  The Promotional Agreement gave GTP and Square Ring the exclusive right to promote Ward's boxing matches from 2004 to 2009.  The Agreement contained an arbitration clause stating that "all controversies concerning the validity and/or enforceability of the promotional contract and this addendum shall be submitted for arbitration" to the CSAC.  (Docket Entry No. 1, Ex. 4, Exs. 1-B and 1-C).  In 2004, GTP and Square Ring also signed a separate Copromotion Agreement relating to and incorporating their Promotional Agreement with Ward.  The Copromotion Agreement specified that GTP and Square Ring would evenly split the costs and net revenues from the Promotional Agreement with  Ward.  (Docket Entry No. 1, Ex. 4, Ex. 1-A).

In 2008, Square Ring sold its interest in the Copromotion Agreement to Leonard Productions. (Docket Entry No. 1, Ex. 4, Ex. 1).  After this sale, Leonard Productions provided various promotional services for Ward's boxing matches under the 2004 Promotional Agreement until it

2

expired in 2009. (Docket Entry No. 19, Ex. 7 at 3). Leonard Productions alleges that in 2011, it entered into an oral copromotional agreement with GTP. Leonard Productions alleges that "the parties agreed that they would continue to conduct business together along the same terms as the 2004 agreement and that Leonard, GTP and Goossen would continue to act in partnership in the co-promotion of fights involving Andre Ward." (Docket Entry No. 1, Ex. 4, Ex. 1). Leonard Productions alleges, and GTP denies, that the oral copromotional agreement contemplated promoting other boxers besides Ward, and significant activities in Texas by Leonard Productions and GTP. (*Id.*).

Leonard Productions alleges that it, GTP, Goossen, and Ward together decided to promote and hold six boxing matches for Ward over three years. Leonard Productions alleges that the parties agreed that GTP and Leonard Productions would copromote Ward's matches, sharing revenues and losses equally. (Docket Entry No. 19, Ex. 7 at 4). GTP and Ward were the only parties to the written Exclusive Promotional Agreement that Leonard Productions alleges resulted from these discussions. (Docket Entry No. 12 at 4). The Exclusive Promotional Agreement stated that: GTP was Ward's exclusive promoter; California law applied; and the parties agreed to arbitrate "[a]ny controversies and/or disputes concerning and/or arising under this Agreement and/or arising under the Addendum" before the CSAC. (Docket Entry No. 19, Ex. 2 at 17). Leonard Productions was not a party to or mentioned in the written Exclusive Promotional Agreement. Leonard Productions explains this omission by the fact that it was not registered as a boxing promoter with the CSAC. (Docket Entry No. 19, Ex. 7 at 4). Goossen told Leonard in an e-mail that "[a]s you and I have discussed in the past and recently, to be listed on the [A]greement (which is no problem) you need to become a licensed promoter in California, which you've said is not a problem for you not to be

3

listed on the [A]greement." (*Id.*).  Although Leonard Productions was not included in the Exclusive Promotional Agreement, GTP and Ward allegedly treated Leonard Productions as Ward's copromoter, and Leonard Productions copromoted Ward's matches as Square Ring had in the past. (Docket Entry No. 19, Ex. 7 at 4).

The first of the six boxing matches provided for in the Exclusive Promotional Agreement went as planned in September 2012.  (*Id.* at 2).  Leonard Productions received 50 percent of the net revenue from that first match.  (*Id.* at 5).   GTP entered into an agreement with HBO to broadcast the match to HBO's subscribers in exchange for a flat fee.   HBO's subscribers are located throughout the United States, including Texas.  (Docket Entry No. 5, Ex. A).

In early 2013, the relationship between Ward and GTP deteriorated.  Ward invoked the arbitration clause under the Exclusive Promotional Agreement, seeking an order declaring the Exclusive Promotional Agreement void because GTP had not disclosed the oral copromotional agreement with Leonard Productions to the CSAC.  (Docket Entry No. 19, Ex. 7).

An arbitrator appointed by the CSAC held hearings. Antonio Leonard attended as a nonparty witness and was present throughout the arbitration.  (Docket Entry No. 27, Ex. 2).  Goossen, Ward, Leonard, and Ward's manager James Prince all testified that they had intended Leonard Productions to copromote Ward's matches with GTP.  (Docket Entry, No. 19, Ex. 7).

The arbitrator concluded that GTP's failure to disclose the oral copromotional agreement with Leonard Productions to the CSAC violated both California law and the Exclusive Promotional Agreement.  The arbitrator, however, declined to void or invalidate the Exclusive Promotional Agreement because Ward knew of and encouraged the copromotional relationship.  The arbitrator's order concluded: "[t]he Commission hereby finds that the Exclusive Promotional Rights Agreement

4

dated April 6, 2011 between Andre Ward and Dan Goossen is valid." (Docket Entry No. 19, Ex. 7 at 17–18). The arbitrator's order also stated that "the remedy for breaches of [the obligation to disclose any copromotional agreement to the CSAC] are the voiding of the outside agreements, the agreement or agreements involving Mr. Leonard, not the Agreement between Mr. Ward and Goossen-Tutor Promotions, LLC." (*Id.* at 16).

Shortly after the arbitration order issued, GTP informed Leonard Productions that it would not honor any agreement to copromote Ward. (Docket Entry No. 1, Ex. 4). Leonard Productions sued GTP and Goossen in Texas state court, claiming that they had breached their copromotional agreement with, and fiduciary duty to, Leonard Productions. (*Id.*). GTP and Goossen timely removed on the basis of diversity jurisdiction and moved to dismiss for lack of personal jurisdiction. Alternatively, they argue that the validity of the oral copromotional agreement between GTP and Leonard Productions was conclusively determined by the CSAC arbitration. The defendants also moved to compel Leonard Productions to arbitrate its claims before the CSAC.

Each of these issues is examined in turn.

## II. The Motion to Dismiss Based on Lack of Personal Jurisdiction

### A. The Legal Standard

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the "plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident, but it need only make a prima facie case" if the district court does not conduct an evidentiary hearing. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citing *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.1994)). In deciding whether personal jurisdiction exists, "the district court may receive 'any combination of the recognized methods of discovery,' including affidavits, interrogatories, and depositions to

assist it in the jurisdictional analysis." *Little v. SKF Sverige AB*, No. H–13–cv–1760, 2014 WL 710941, at *3 (S.D. Tex. Feb. 24, 2014) (quoting *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008)).

"Proof by a preponderance of the evidence is not required." *Johnston*, 523 F.3d at 609 (citing *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)). "'[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists.'" *Id.* (quoting *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985)). "When the factual differences are found in favor of [a plaintiff] at this motion phase in the litigation . . . [it] has presented a prima facie case for personal jurisdiction." *Id.* The "court resolves all conflicts in the evidence in favor of the plaintiff and accepts as true all of the plaintiff's uncontroverted allegations." *Little*, 2014 WL 710941, at *3 (citing *Johnston*, 523 F.3d at 609).

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009). "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014) (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291 (1980)). "'Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis.'" *Mullins*, 564 F.3d at 386 (quoting *Johnston*, 523 F.3d at 609). "To satisfy the requirements of due process, the plaintiff must

demonstrate '(1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Johnston*, 523 F.3d at 609).

As a general principle, a "defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "There must be some act whereby the defendant 'purposely avails [itself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Burger King*, 471 U.S. at 379).

A court may exercise general personal jurisdiction over nonresident defendants "to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render [them] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011). The Fifth Circuit has explained that "[t]he continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 419 (5th Cir. 2001). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Johnston*, 523 F.3d at 609.

Specific personal jurisdiction "is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Goodyear*, 131 S. Ct. at 2851

(citation omitted). The question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 2854 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121.

A court considers two issues in deciding whether a defendant's suit-related conduct creates a sufficient relationship with the forum state. *See id.* at 1122. "First, the relationship must arise out of contacts that the 'defendant himself' creates with the forum State." *Id.* (quoting *Burger King,* 471 U.S. at 475). The limits imposed on a state's "adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of the plaintiff[ ] or third parties." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. at 291–92). The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984)). The "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Id.* "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

"Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citations omitted). A

"plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* "[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Id.* (quotation omitted); *see AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC,* 878 F. Supp. 2d 779, 787 (S.D. Tex. 2013) ("[S]pecific jurisdiction may not be based on the mere fortuity that a plaintiff is a Texas resident.").

### B.   General Personal Jurisdiction

Leonard Productions alleges that this court has general jurisdiction over the defendants because from 2011 to 2013 they applied for a boxing license in Texas; promoted at least two boxing matches in the state; sold tickets to matches to Texas residents; recruited two Texas boxers (Ricardo Williams and Cornelius White); and sold HBO the right to broadcast matches, including to subscribers in Texas. (Docket Entry No. 17 at 9–10).

The present record does not show that GTP or Goossen were "at home" in Texas. It is undisputed that both defendants are California citizens and maintain their principal places of business there. Neither GTP nor Goossen has offices, bank accounts, employees, or business records in Texas; owns real property in Texas; regularly travels to Texas for business; or derives substantial revenue from services in Texas.

Leonard Productions's allegations focus on contacts related to the disputed partnership agreement.  There are no factual allegations or arguments supporting "dispute-blind" general jurisdiction.  Leonard Productions asserts that GTP and Goossen engaged in activities in Texas related to that partnership and the present dispute, but neither the nature, extent, nor duration of the alleged activities provide a *prima facie* basis for finding general jurisdiction over either defendant.

## C.     Specific Personal Jurisdiction

In support of its argument that this Texas court may exercise specific personal jurisdiction over GTP and Goossen, Leonard Productions alleges that in 2011 it entered into an oral copromotional partnership of unlimited duration with GTP, contemplating that Leonard Productions, as a controlling partner, would perform many partnership managerial functions in Texas.  (Docket Entries Nos. 1, Ex. 4 at 3; 17, Ex. A).  These functions included meeting with boxers in Texas; negotiating and finalizing contracts with boxers; funding the boxers' preparations, signing bonuses, and contracts; managing merchandise sales; and promoting ticket sales for in-person events. (Docket Entry No. 17, Ex. A).  Leonard Productions alleges that to carry out the partnership, it promoted boxing matches in Texas and recruited and agreed to promote two Texas boxers, Ricardo Williams and Cornelius White, besides Ward.  (*Id.*).  Leonard Productions claims that in furtherance of the partnership, GTP registered for a boxing license in Texas and promoted events in Texas. Leonard Productions supports its jurisdictional allegations with Antonio Leonard's sworn affidavits and with documents from the Texas Department of Licensing and Regulation.  (Docket Entry No. 17, Exs. A, B).

GTP and Goossen do not dispute that Leonard Productions and GTP agreed to copromote matches for Ward; that GTP held a Texas boxing license from 2011 to 2012; and that GTP entered

into an agreement with HBO to broadcast certain matches to HBO's cable subscribers in exchange for a flat fee.  (Docket Entry Nos 5, Ex. A; 20, Ex. A).  The defendants argue that any agreement between them and Leonard Productions was not a partnership agreement and was negotiated in California or Nevada, not Texas.  (Docket Entry No. 5, Ex. A).  They allege that the copromotional agreement with Leonard Productions was performed in California or Nevada, and that Goossen and Leonard never met in Texas.  They claim that any payments made to Leonard Productions under the copromotional agreement were made outside of Texas.  According to the defendants, they have never promoted any boxing matches in Texas with Leonard Productions or entered into any agreement with Ricardo Williams or Cornelius White, two Texas boxers.  (Docket Entry No. 20, Ex. A).  Goossen and GTP allege that they did not ask or direct Leonard Productions to take actions in Texas, making its conduct in the state "unilateral."  (Docket Entry No. 20 at 14).  The defendants support their jurisdictional allegations with Goossen's sworn affidavits.  (Docket Entry Nos. 5, Ex. A; 19, Ex. 1; 20, Ex. A).

"Merely contracting with a resident of the forum state does not establish minimum contacts." *Montcrief Oil Int'l v. OAO Gazprom*, 481 F.3d. 309, 311 (5th Cir. 2007).  An out-of-state party's failure to pay amounts due under a contract to an in-state party does not show jurisdiction.  *See Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994).  But a Texas court may exercise personal jurisdiction over an out-of-state party whose contract with a Texas party contemplates significant performance in Texas.  While unilateral actions of the Texas-based party do not show minimum contacts in Texas, a "purposeful and affirmative action, the effect of which is to cause business activity (foreseeable by the defendant) in the forum state" may suffice.  *Cent.*

*Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 382 (5th Cir. 2003) (citing *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982).

The parties' affidavits present conflicting jurisdictional evidence.  In a motion to dismiss, a court "must accept the plaintiff's uncontroverted allegations as true, and resolve in his favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).  This court must resolve all factual conflicts in favor of Leonard Productions.  Applying this rule, the court finds that Leonard Productions has made a *prima facie* showing of contacts sufficient to support specific personal jurisdiction in Texas over the defendants.  The allegations and evidence as to the actions contemplated by the alleged copromotional agreement between Leonard Productions and the defendants also supports the evidence that the defendants took "purposeful and affirmative action" to cause business activity in Texas. *Mississippi Interstate*, 681 F.2d at 1007 (internal marks omitted). *Marathon Metallic Building Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921, 923 (5th Cir. 1981).  Leonard Productions's claims for breach of contract and breach of fiduciary duty arise out of these Texas activities by the defendants. (Docket Entry No. 12).

Leonard Productions alleges that it entered into a partnership agreement with GTP providing that Leonard Productions would further the partnership through extensive actions in Texas.  Leonard Productions's affidavits support its allegations that, under the partnership agreement, Leonard Productions performed extensive promotional and managerial activities in Texas for Ward and other boxers, including two residing in Texas.  (Docket Entry No. 1, Ex. 4, Ex. 1).

The affidavits also support the allegations that the defendants arranged to have HBO broadcast the boxing matches organized by GTP and Leonard Productions to subscribers, including

in Texas. *See Indianapolis Colts, Inc. v. Metro Baltimore Football Club, Ltd.*, 34 F.3d 410 (7th Cir. 1994) (the fact that the defendants used ESPN2 to broadcast games, including to Indiana residents, was not "critical," but did show that "the defendant had also entered the state in some fashion" through the broadcasts) (internal marks omitted); *Central Sports Army Club v. Arena Assocs, Inc.*, 952 F. Supp. 181 (S.D.N.Y. 1997) (finding that a defendant hockey league had a "presence" in New York in part because "[the defendant] deals with cable networks in New York City that broadcast [the defendant's] games in New York and elsewhere.").

Once a *prima facie* showing of minimum contacts is made, the defendants have the burden of showing that the exercise of jurisdiction is not fair and reasonable. *McFadin v. Gerber*, 587 F.3d 753, 759–760 (5th Cir. 2009). Five of the factors include: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' care v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006).

The defendants allege that exercising jurisdiction over them would offend notions of fair play and substantial justice because the relief Leonard Productions seeks would violate California law and the CSAC arbitration order. (Docket Entry No. 5 at 8). They also argue that California would be a more appropriate forum because California law governs the Exclusive Promotional Agreement and because witnesses and evidence are more readily available in California. (Docket Entry No. 20 at 16). The defendants also claim that because they are not Texas residents and have limited connections to the State, forcing them to litigate this dispute in Texas would be a substantial burden. (*Id.* at 15). Leonard Productions responds that the defendants have already voluntarily submitted

13

themselves to jurisdiction in Texas by applying for and obtaining a boxing license here in 2011. Leonard Productions also asserts that Texas has an interest in resolving a dispute over a partnership agreement involving Texas boxers and requiring significant performance in Texas.  (Docket Entry No. 17 at 10).

The court finds that, based on the record, the exercise of jurisdiction over the defendants is neither unfair nor unreasonable.  Leonard Productions has alleged and presented evidence that the defendants engaged in purposeful and affirmative action directed at Texas by entering into a partnership that required Leonard Productions to perform significant activities in Texas, and by directing its own promotional activities toward Texas to carry out that partnership.  These contacts give both Leonard Productions and Texas an interest in resolving the suit here.  The defendants have not shown that the exercise of jurisdiction over them would be unfairly burdensome, given their Texas contacts, or that this court would be unable to fairly and efficiently resolve the dispute.

The motion to dismiss based on the lack of personal jurisdiction over the defendants is denied.

## III.    The Motion to Dismiss Based on Issue Preclusion

GTP and Goossen assert that the CSAC arbitration between Ward and the defendants resulted in an order concluding that the copromotional agreement between GTP and Leonard Productions was invalid.  They argue that this determination binds Leonard Productions because Antonio Leonard appeared as a witness in the arbitration and was present throughout the proceedings, and because Ward adequately represented Leonard Productions's interests in the arbitration.  (Docket Entry No. 19).

14

Issue preclusion, or collateral estoppel, bars a party "from litigating an issue already raised in an earlier action between the same parties only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action."[2] *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004) (footnotes omitted).[3]

Collateral estoppel applies to issues determined in arbitration. *Universal American Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991). In *Universal American Barge*, the Fifth Circuit rejected a challenge to the "application of offensive collateral estoppel because the primary

---

[2] "[S]ome cases . . . have recognized a fourth requirement that there be 'no special circumstance that would render preclusion inappropriate or unfair.'" *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 n.12 (5th Cir. 1995) (quoting *United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994)). The *RecoverEdge* court found it unnecessary to decide whether this fairness requirement existed, but noted that it "originated as a limitation on *offensive* collateral estoppel," which "arises when a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against *another plaintiff*." *Id.* (second emphasis added) (citations omitted). The *RecoverEdge* case "involve[d] traditional, or mutual estoppel because the relevant parties in the conspiracy case were the same as the parties in the dischargeability proceeding." *Id.* (citation omitted). Because the issue sought to be precluded here was not actually litigated in the prior proceeding, whether this fairness requirement applies need not be addressed.

[3] The parties rely on Texas and federal law on issue preclusion in their briefs. In *Universal*, the Fifth Circuit applied federal law to determine whether to give an arbitral award preclusive effect. *See Universal American Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991). This court has previously applied federal law to determine whether an arbitral award resolving state-law issues but that was confirmed by a federal court judgment was entitled to preclusive effect, while noting that the question was unsettled. *See Tremont LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 821 (S.D. Tex. 2010) (noting that there was no conflict between federal law and the potentially applicable state laws of Delaware and Texas). The arbitration order in this case resolved issues of California state law. California law bars the application of collateral estoppel against parties who have not specifically agreed to be bound by an arbitral award. Applying California law would not change this court's conclusion that the CSAC's determination that the copromotional relationship violated California law and CSAC rules, but was valid, does not bind Leonard Productions in this case. *See Vandenberg v. Superior Court*, 21 Cal. 4th 815, 834 (1999) ("we are compelled to conclude that a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of third persons unless the arbitral parties agreed, in the particular case, that such a consequence should apply.").

determination was rendered in an arbitration proceeding, rather than in a 'court of law.'" 946 F.2d

at 1136.  The court explained:

> The United States Supreme Court declined to bar the offensive use of collateral estoppel from arbitration in subsequent federal court litigation, though the Court required consideration of the "federal interests warranting protection."  In an arbitrable case not directly involving federal statutory or constitutional rights, courts should use a case-by-case approach to determining the collateral estoppel effects of arbitral findings.

*Id.* at 1136–37 (footnote and internal citation omitted).  The Fifth Circuit described some

considerations in deciding whether to apply issue preclusion to an arbitration decision:

> If the first determination of an issue occurred in an arbitration which afforded litigants the "basic elements of adjudicatory procedure," a district court may find in a proper case that the arbitral award collaterally estops relitigation of the previously determined issues.  A district court in exercising its discretion must carefully consider whether procedural differences between arbitration and the district court proceeding might prejudice the party challenging the use of offensive collateral estoppel.
>
> The district court specifically must determine whether procedural opportunities available to the party in the subsequent action "might be likely to cause a different result."

*Id.* at 1137–38 (internal citation omitted).

The record shows that the arbitrator's statement that the copromotional agreement between

GTP and Leonard Productions violated California law and the CSAC regulations and could be

declared void as a result of its nondisclosure does not meet the issue-preclusion elements.  Issue

preclusion does not apply unless an issue was actually litigated and adjudicated in a prior

proceeding, and was necessary to the adjudication.  *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th

Cir. 2013); *see also Universal Amer. Barge*, 946 F.2d at 1136 (applying offensive collateral estoppel

to an issue decided in an arbitral award).  Although the CSAC's order suggests that voiding the

copromotional agreement between GTP and Leonard Productions would be an adequate remedy for GTP's failure to disclose that agreement, this issue was neither actually litigated nor necessary for the arbitrator's decision.

"As a general rule, an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, and actually determined." *Matter of Gober*, 100 F.3d 1195, 1203 (5th Cir. 1996).  The parties asked the arbitrator to decide the validity of the Exclusive Promotional Agreement signed between GTP and  Ward.  (Docket Entry No. 19, Ex. 7 at 2).  The arbitration order states that "[t]his proceeding's purpose is to arbitrate the breach of contract dispute over the Exclusive Promotional Rights Agreement between Mr. Ward and Goossen-Tutor Promotions, LLC."  (*Id.* at 14).  Ward did not raise the invalidity of the oral copromotional agreement in his arbitration request.  Nor does the issue appear to have been raised in either GTP's or Ward's pleadings before the arbitrator.  During the arbitration hearings, GTP, Goossen, Ward and his manager, and Leonard all testified that they believed the copromotional agreement between GTP and Leonard Productions was valid and that they had intended it to be valid.  (Docket Entry No. 19, Ex. 7 at 4–5).  No party asserted that the copromotional agreement was invalid in the pleadings, submissions, or testimony before the arbitrator.  The issue of its lack of validity was not actually litigated.

In addition, the arbitrator's statement that "the remedy for breaches of [the disclosure requirements] are the voiding of the outside agreements, the agreement or agreements involving Leonard [Productions], not the Agreement between Ward and Goossen-Tutor Promotions, LLC," was unnecessary to the arbitrator's decision.  (*Id.* at 16).  The issue submitted to the arbitrator was whether the Exclusive Promotional Agreement should be voided or invalidated because GTP failed

17

to disclose to the CSAC its copromotional agreement with Leonard Productions.  The arbitrator stated that Goossen and GTP had violated California law and breached the Exclusive Promotional Agreement by failing to disclose the copromotional agreement.  But the arbitrator declined to void or find the Exclusive Promotional Agreement invalid on that basis.  Instead, the arbitrator found that Ward knew of, encouraged, and consented to the copromotional relationship between GTP and Leonard Productions.  (*Id.* at 15–16).  In the final paragraph of its order, the arbitrator stated that "the Commission hereby finds that the Exclusive Promotional Rights Agreement dated April 6, 2011 between Andre Ward and Dan Goossen is valid."  (*Id.* at 17–18).  The arbitrator did not need to decide that the oral copromotional agreement between Leonard Productions and GTP was invalid or void to rule on the Exclusive Promotional Agreement.

Because the invalidity of the oral copromotional agreement was neither actually litigated nor necessary to the arbitrator's decision on the Exclusive Promotional Agreement, any determination of that issue does not have preclusive effect here.  It is unnecessary to consider Leonard Productions's remaining challenges to the arbitration.

## IV.   The Motion to Compel Arbitration Based on Direct-Benefits Estoppel

GTP and Goossen argue that this court should compel Leonard Productions to arbitrate its claims under the arbitration clause contained in the Exclusive Promotional Agreement.  (Docket Entry No. 19, Exs. 2 and 3).  Although Leonard Productions was not a party to that Agreement, GTP argues that direct-benefits estoppel applies to require arbitration.  (Docket Entry No. 19).

A nonsignatory to an arbitration agreement may be required to arbitrate under agency or contract-law principles.[4] *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.") (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,*

---

[4] It is unclear whether state or federal law applies to the question of whether a nonsignatory can be bound to an agreement to arbitrate. "Federal courts asked to compel arbitration generally apply state law on contract formation and validity to determine whether contracting parties agreed to arbitrate a dispute. Federal courts often look to the federal law of arbitrability to determine whether a nonsignatory may be compelled to arbitration, but the cases are not wholly consistent." *Med-IM Dev., Inc. v. Gen. Elec. Capital Corp.*, No. H-07-1618, 2008 WL 901489, at *3 (S.D. Tex. March 31, 2008) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267–68 (5th Cir. 2004) (applying federal law); *Bridas*, 345 F.3d at 355–63 (applying federal law); *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1074–77 (5th Cir. 2002) (applying state law)). The Fifth Circuit previously noted that "nearly all federal circuit courts faced with the specific question posed . . .—namely, to what extent a non-signatory is bound by an arbitration provision contained in a contract she is suing under—have applied the federal substantive law of arbitrability to resolve the issue." *Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 267 n.6 (5th Cir. 2004). In 2009, the Supreme Court addressed the issue of which law should be applied to agreements to arbitrate in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). The Supreme Court stated that the FAA "creates substantive federal law regarding the enforceability of arbitration agreements," but does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." The Court held that the Sixth Circuit had erred in denying a nonsignatory's request to compel arbitration against a signatory "[b]ecause 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Id.* (internal citations omitted). Following *Arthur Andersen*, the Fifth Circuit has continued to apply federal law to the question of whether a *signatory* can compel a *nonsignatory* to arbitrate under a theory of direct-benefits estoppel. *See Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) ("We note that the application of estoppel to compel [nonsignatory] Noble to arbitrate is governed by federal law in this case.") (citing *Washington Mut.*, 364 F.3d at 267 n.6) and *Blaustein v. Huete*, 449 F. App'x 347, 350 (5th Cir. 2011) (applying federal law without discussing whether state law should apply); *but see Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 336 (5th Cir. 2010) ("In *Carlisle,* the Supreme Court made clear that state law controls whether an arbitration clause can apply to nonsignatories." and "state contract law principles control whether nonsignatories can be bound to arbitrate"). The parties have argued federal law. Both Texas and California law permit a nonsignatory to be compelled to arbitrate under a theory of direct-benefits estoppel. *See JSM Tuscany, LLC v. Superior Court*, 123 Cal. Rptr. 3d 429, 443 (Cal. Ct. App. 2d 2011); *Boucher v. Alliance Title Co.*, 25 Cal. Rptr. 3d 440, 446–47 (Cal. Ct. App. 2d 2005); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005).

*S.A.S.*, 269 F.3d 187, 195–97 (3d Cir. 2001); *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61–64 (2d Cir. 2001) (analyzing whether to bind a nonsignatory to an arbitration agreement under: (1) direct-benefits estoppel theory; (2) an alternative estoppel theory that prevents a signatory from avoiding arbitration with a nonsignatory when the issues to be resolved are intertwined with the arbitration agreement; and (3) veil-piercing).

The defendants argue that Leonard Productions should be compelled to submit its claims to arbitration before the CSAC under a theory of direct-benefits estoppel.  "Direct benefits estoppel applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" *Bridas*, 345 F.3d at 361–62 (quoting *DuPont*, 269 F.3d at 199); *cf. Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006) (binding a nonsignatory to a forum-selection clause under a direct-benefits estoppel theory).

According to the defendants, Leonard Productions is bound by the arbitration clause contained in the Exclusive Promotion Agreement because its claims require reference to the Exclusive Promotional Agreement and necessarily arise from or concern that contract.  Leonard Productions responds that it is not suing under the Exclusive Promotional Agreement between GTP and Ward, but under its alleged oral copromotional agreement with GTP.  According to Leonard Productions, it is neither receiving direct benefits from the Exclusive Promotional Agreement nor seeking to exploit it.  (Docket Entry No. 27 at 22).  The issues are whether Leonard Productions received direct benefits under the Exclusive Promotional Agreement and whether direct-benefits estoppel can apply when Leonard Productions has not sued the defendants under the Exclusive Promotional Agreement.

In *Wood v. PennTex Resources, L.P.*, 458 F. Supp. 2d 355 (S.D. Tex. 2006), this court reviewed direct-benefits estoppel cases and noted that while the *Bridas* court had declined to apply direct-benefits estoppel in part because the nonsignatory had not sued the signatory under the agreement containing the arbitration clause and had not thereby "exploited" the agreement containing the clause, *Wood*, 458 F. Supp. 2d at 368, "[o]ther cases have not focused on whether the nonsignatory filed a suit or claim against the signatory based on the agreement containing the arbitration clause but . . . focused instead on whether the evidence showed that the nonsignatory received direct and substantial benefits from that agreement." *Id.* In analyzing direct-benefits estoppel, "[t]he keys are whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under that contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract." *Id.* at 371; *see also AICO Int'l, E.C. v. Merrill Lynch & Co.*, 98 F. App'x 44, 46 (2d Cir. 2004) (unpublished) ("Estoppel of an unwilling non-signatory requires a showing, absent here, that the non-signatory 'knowingly exploited' the benefits of an agreement with an arbitration clause and derived a 'direct benefit' from the agreement.") (citing *MAG Portfolio Consult, GMBH*, 268 F.3d at 61–62).

In *Wood*, this court also examined cases evaluating what constitutes a "direct benefit" triggering estoppel. In *Weekley Homes*, the nonsignatory had received direct and substantial benefits under the contract between the signatories, the home-purchaser and the defendant home-builder, because:

> [c]laiming the authority of the Purchase Agreement, she directed how
> [the home-builder] should construct many of its features, repeatedly

21

> demanded extensive repairs to 'our home,' personally requested and
> received financial reimbursement for expenses 'I incurred' while
> those repairs were made, and conducted settlement negotiations with
> [the home-builder] (apparently never consummated) about moving the
> family to a new home.

*Wood*, 458 F. Supp. 2d at 367 (quoting *Weekley Homes*, 180 S.W.3d at 133).  The *Weekley Homes*

court compelled the nonsignatory plaintiff to arbitrate the dispute with the defendant signatory

home-builder under direct-benefits estoppel, explaining: "'when a nonparty consistently and

knowingly insists that others treat it as a party, it cannot later turn [ ] its back on the portions of the

contract, such as an arbitration clause, that it finds distasteful.  A nonparty cannot both have his

contract and defeat it too.'"  *Id.* (quoting *Weekley Homes*, 180 S.W.3d at 135) (footnote and

additional internal quotation marks omitted).

In *Wood*, this court concluded that the nonsignatory had received direct benefits because he

had participated in negotiating the relevant agreement, was named in the agreement, and had been

involved in the agreement's execution and performance.  *Id.*  Other facts also supported the

conclusion that the nonsignatory received direct benefits from the agreement containing the

arbitration clause, including that the agreement: provided the nonsignatory with protection against

individual exposure from certain claims; indemnified the nonsignatory for certain claims; and named

the nonsignatory as an indemnified party.  *Id.*  The defendant in *Wood* had complied with its

contractual obligations to post a letter of credit to secure the indemnity obligation and to give the

nonsignatory a complete release for certain claims.  *Id.* at 371.

In *Hellenic Investment Fund*, 464 F.3d at 514, the Fifth Circuit held that a nonsignatory was

bound by a forum-selection clause under direct-benefits estoppel.  In *Hellenic*, the nonsignatory

purchased a vessel in reliance on the defendant's issuance of a necessary certificate.  *Id.* at 516.  The

22

defendant, a classification society, had conducted the certification inspection under its certification contract with the vessel's seller.  *Id.* at 515–16.  The nonsignatory sued the classification society for fraudulently misrepresenting that the vessel was free of defects.  The defendant moved to dismiss based on a forum-selection clause in the certification contract between the vessel's seller and the certification society.  *Id.* at 516–17.  The plaintiff argued that it was not bound by those rules because it was not a signatory to the certification contract between the seller and the defendant.  *See id.* at 517.  The Fifth Circuit concluded that the plaintiff was bound to the contract's forum-selection clause because the plaintiff directly benefitted from the defendant's performance of that contract with the seller.  *Id.* at 519.  In the memorandum of agreement to sell the vessel, "Hellenic specifically acknowledged receiving and reviewing classification documents that expressly refer to the DNV Rules . . . .  Hellenic specifically admitted before the district court that 'without . . . that [certificate], we wouldn't have done the deal.'"  *Id.*  The court also noted that the plaintiff was aware that the defendant would perform the inspections and that the vessel's "ability to be flagged and operate in commerce was founded on" the issuance of the certificate.  *Id.*  In addition to the "many benefits flow[ing] directly to Hellenic when DNV performed its contract with Inlet," the court stated:

> [T]here is no denying, indeed it is specifically admitted, that, at the critical moment of sale, DNV's performance was essential to Hellenic's decision to purchase the MARIANNA.  Any lingering doubt whether Hellenic garnered a benefit from DNV's performance of the DNV-Inlet contract is erased by Hellenic's own statements in its complaint: "DNV knew, or should have known," that its representations "were intended for [Hellenic]'s *guidance and benefit* in a business transaction."

*Id.*

23

In *Huntsman*, this court reviewed the relevant cases and applied direct-benefits estoppel against a nonsignatory. *Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 200–208 (S.D. Tex. 2008). Huntsman was insured through IRIC, a company it owned and controlled, which in turn reinsured the Huntsman policy with certain reinsurers. *Id.* at 185. When Huntsman sought direct payment from the reinsurers, the reinsurers sued to compel Huntsman to arbitrate under a clause contained in the reinsurance certificates they had issued to IRIC. *Id.* at 185–86. Huntsman moved to dismiss. This court found that the reinsurers had sufficiently alleged that Huntsman had sought a direct benefit under the reinsurance certificates by seeking and obtaining payment under those certificates. *Id.* at 208.

Courts in other jurisdictions have reached similar results. In *Legacy Wireless Services v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045 (D. Or. 2004), the court found direct benefits. The nonsignatory had received fees under an agreement with the defendant and had allegedly "played an important role in the consummation of the agreement and in assisting [a signatory's] fulfilling its contractual obligations." *Legacy Wireless*, 314 F. Supp. 2d at 1056–57 (quoted in *Wood*, 314 F. Supp. 2d 1056–57). Under the agreement, one party was to pay the other "administrative fees," and the receiving party had to pay a percentage of those fees to a nonsignatory under a separate agreement. *Id.* "[C]onstruing the two agreements together, it appears that [the nonsignatory] received 'direct benefits'" from the agreement with the arbitration clause "in the form of 'administrative fees' paid" under that agreement. *Id.* (footnote omitted).

In *World Group Securities, Inc. v. Allen*, the court also concluded that the nonsignatory had received direct benefits from a contract with an arbitration provision. No. CV 07-1657-PHX-JAT, 2007 WL 4168572 (D. Ariz. Nov. 20, 2007). In that case, the defendants invested in mutual fund

and insurance products through WMA Securities, Inc. ("WMAS"). *Id.* at *1. The defendants signed an account agreement with WMAS that contained an arbitration clause. *Id.* World Group Securities, Inc. ("WGS") acquired certain WMAS assets, including the defendants' accounts. *Id.* The defendants started arbitration proceedings against WGS, which argued that it was not obligated to arbitrate. *Id.* WGS acknowledged that it had knowingly received fees generated from the defendants' accounts after becoming their broker. *Id.* at *4. The court found that the defendants' obligation to pay those fees derived from the agreement containing the arbitration clause. *Id.* The court rejected the theory that the benefit was only indirect because the fees were paid first the investment-product providers, who then paid part to WGS. *Id.* at *4. "Pass-through arrangements like the one between WGS and the product providers are entirely contingent on the initial obligation. This Court, therefore, does not hesitate to conclude that WGS's fees derived directly from Defendants' obligation to pay them, which is found in the contract containing the arbitration clause." *Id.* (citing *Legacy Wireless*, 314 F. Supp. 2d at 1056). "To hold otherwise would require this Court to ignore the realities of the financial arrangement under consideration." *Id.*

A nonsignatory may obtain benefits from a contract between a signatory and the defendant that are too tangential to support estoppel. For example, in *Thomson-CSF*, the court held that the alleged benefit of eliminating competition was "not the sort of benefit which this Court envisioned as the basis for estopping a nonsignatory from avoiding arbitration." *Thomson-CSF*, 64 F.3d at 779. The nonsignatory had not directly benefitted by seeking to purchase equipment, and the alleged benefit resulted from the nonsignatory's purchase of a signatory, not from the signatory's agreement containing the arbitration clause. *See id.*

Similarly, in *MAG Portfolio Consult, GMBH*, 268 F.3d at 61, direct-benefits estoppel did not apply because the benefits were indirect.  The court explained that "the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of the parties to an agreement, but does not exploit (and thereby assume) the agreement itself."  *Id.* (citing *Thomson-CSF*, 64 F.3d at 778–79).   The court found direct-benefits estoppel inapplicable to the nonsignatories, who were successors to the signatories, because "assuming [no alter-ego relationship], there is no relationship between the signatories and the nonsignatory except that they are competitors for the same business."  *Id.* at 63.

In *Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682, 684 (7th Cir. 2005), an insurance company issued a company and its subsidiary primary liability policies and deductible agreements.  The deductible agreements had arbitration clauses, but the primary liability policies did not.  *Id.*  The subsidiary company did not sign any of the deductible agreements.  *Id.* The court noted that the subsidiary had not sought to enforce any rights under the deductible agreements.  *Id.* at 688.  "Even assuming that [the subsidiary] has benefitted from the deductible agreements by paying lower insurance premiums based on the deductibles, this benefit is too attenuated and indirect to force arbitration under an estoppel theory."  *Id.*

In *Phoenix Companies, Inc. v. Abrahamsen*, No. 05 Civ. 4894(WHP), 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006), the court also found direct-benefits estoppel inapplicable because the benefits were indirect.  In *Phoenix Companies*, the nonsignatory derived benefits from the relationship between the parties who had agreed to arbitrate, by virtue of various corporate relationships and separate contracts.  But the nonsignatory did not have any involvement in executing or performing the contract that led the signatories to sign forms containing an arbitration

clause. *Id.* The nonsignatory had nothing to do with the signatories' decision to sign the forms with the attached arbitration clause. *Id.* The court held that "[b]ecause there is no evidence that Phoenix realized any direct benefits from Griffith's relationships with the Financial Advisors, this Court finds that it would be improper to compel arbitration on an estoppel theory." *Id.* (citations omitted).

In *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 02152(PKL), 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008), the court also found that direct-benefits estoppel did not apply because the nonsignatory did not receive a direct benefit from the contract with the arbitration clause. In that case, an attorney worked for a law firm and left to join another firm. *Id.* at *1. The attorney's professional corporation and the first law firm had signed a contract agreeing to divide the attorney's cases when he left and to divide future fees from certain cases initiated by the attorney. *Id.* That agreement contained an arbitration clause. *Id.* After the attorney moved to his new firm, a dispute arose as to the fees the second firm received for settling a case that the attorney originated at the first firm. *Id.* The first firm initiated arbitration against the attorney, his professional corporation, and his new firm. *Id.* at *2. The new firm argued that it could not be compelled to arbitrate because it had not signed the contract with the arbitration clause. *Id.* at *2. The first firm responded that direct-benefits estoppel required the new firm to arbitrate because it had received fees as a "direct benefit" under the Agreement between the attorney and the original firm, fees that otherwise would have been solely the attorney's. *Id.* at *6. The court rejected the argument, holding that although the second law firm had "exploited the contractual relation of the parties to an agreement," by taking over the role of counsel in the . . . case," it had "not exploit[ed] (and thereby assume[d]) the agreement itself." *Id.* at *6 (internal citations omitted). While the first firm claimed an interest in the fees the second firm received from settling the case that the attorney

had begun at the first firm, the court held that this at most showed an indirect benefit from the first firm's agreement with the attorney. *Id.*

Applying these precedents leads to the conclusion that Leonard Productions seeks direct benefits from the Exclusive Promotional Agreement and is bound by the arbitration clause. Leonard Productions sues to recover amounts allegedly owed as a result of the Exclusive Promotional Agreement. Leonard Productions alleges that "Leonard, GTP and Goossen, together with Ward, decided to promote and execute six fights over a period of three years." (Docket Entry No. 12 at 3). Leonard Productions then claims that Ward was paid a signing bonus under the Exclusive Promotional Agreement by both Leonard Productions and GTP, in equal amounts. Leonard Productions also alleges that it paid at least part of "various expenses such as advertising, travel and general expenses of the event[s]" planned and carried out under the Exclusive Promotional Agreement. (*Id.* at 4). Leonard Productions asserts that under this Agreement, for each of the six matches involving Ward, it was entitled "to receive one-half of the net" revenues from the broadcast on HBO and "additional revenues generated from live tickets sold at the gate." (*Id.*). Leonard Productions seeks a declaratory judgment that GTP and Goossen must "deliver Leonard's 50% of funds realized from the future four Ward Fights and other boxers who are the subject of the partnership between Plaintiff and Defendants." (*Id.* at 5). Leonard Productions alleges that GTP and Goossen breached the oral partnership agreement by "inform[ing] Plaintiff that they will not honor their agreement with Leonard to co-promote any of the Ward Fights with Leonard." (*Id.*). Leonard Productions also claims that GTP and Goossen have breached their fiduciary duties to Leonard Productions "by inducing him to contribute money toward the six fight agreement, only to claim all proceeds realized therefrom for themselves." (*Id.* at 6). Leonard Productions's allegations

28

and damages claims show that it is seeking direct benefits under the Exclusive Promotional Agreement and cannot disclaim its arbitration requirement.

Leonard Productions has not only exploited the contract between Ward and GTP for its own benefit, it has also participated in performing the Exclusive Promotional Agreement. Courts have found it reasonable to hold a nonsignatory to an arbitration clause in an agreement when the nonsignatory plays a central role in carrying out the agreement's underlying obligations. *See AHTNA Gov't Servs. Corp. v. 52 Rausch, LLC*, No. 03-00130, 2003 WL 403359 (N.D. Cal. Feb. 19, 2013); *Legacy Wireless*, 314 F. Supp. 2d at 1056; *Wood*, 458 F. Supp. 2d. at 372–73; *World Group Sec.*, 2007 WL 4168572, at *4. Leonard Productions made some or all of the initial payments due to Ward under the Exclusive Promotional Agreement; received a 50 percent share of the net revenues from the first match organized under the Agreement; and alleges that it is owed 50 percent of the net revenues from the five other fights.

As in *Legacy Wireless*, the two contracts must be read together. The Exclusive Promotional Agreement establishes the costs that the promoter must pay and the revenues it will obtain. The alleged oral copromotional agreement between GTP and Leonard Productions requires them to share these costs and revenues equally. In addition, Square Ring, Leonard Productions's alleged predecessor-in-interest, signed a similar agreement to arbitrate as part of the 2004 Copromotion Agreement between GTP, Ward, and Square Ring, which served the same purpose as the Exclusive Promotional Agreement from 2004 to 2009. (Docket Entry No. 19, Ex. 4, Ex. A). Although Leonard Productions argues that it had no knowledge of the Exclusive Promotional Agreement, it was substantively similar to the earlier Copromotion Agreement that Leonard Productions succeeded to, and which was attached as an exhibit to its original complaint. (Docket Entry No. 1, Ex. 4, Exs.

1-B and 1- C).  Leonard declared in his affidavit that he participated in the decision to promote and execute six matches for Ward.  His declarations show that he was familiar with the Exclusive Promotional Agreement's terms, such as the amounts due to each party and how they were to be paid.  According to Leonard, the parties agreed in their discussions that Leonard Productions would copromote Ward under the same terms as in the 2004 Copromotion Agreement.  (Docket Entry No. 1, Ex. 4, Ex. 1).  *Cf. Noble Drilling Services*, 620 F.3d at 469 (declining to apply a theory of direct-benefits estoppel because the nonsignatory did not know of the existence or the terms of the agreement containing the arbitration clause).  Because Leonard Productions has deliberately sought and obtained direct benefits from the Exclusive Promotional Agreement and performed a substantial part of the obligations of that Agreement, it is bound to its arbitration clause under direct-benefits estoppel.

If there is a binding agreement to arbitrate, then the court must decide whether the dispute is within the scope of that agreement.  *Tittle v. Enron Corp.*, 463 F.3d 410, 419 (5th Cir. 2006).  The Federal Arbitration Act (FAA) "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Wash. Mut. Fin. Group*, 364 F.3d at 263 (quotations omitted);  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  The duty to arbitrate remains one of contract; a court cannot compel parties to  arbitrate issues they have not agreed to submit.  *Tittle*, 463 F.3d at 418 (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'")).

The arbitration clause in the Exclusive Promotional Agreement applies to "[a]ny controversies and/or disputes concerning and/or arising under this Agreement." (Docket Entry No. 19, Ex. 2 at 17). "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,* 139 F.3d 1061, 1067 (5th Cir. 1998) (citing *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292, 1295 (9th Cir. 1994) (comparing "relating to" language with "arising out of" language)). "Broad arbitration clauses . . . are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.* An "arbitration clause that cover[s] disputes 'arising under' an agreement, but omit[s] reference to claims 'relating to' an agreement, cover[s] only those disputes 'relating to the interpretation and performance of the contract itself.'" *Tracer Research Corp.,* 42 F.3d at 1295 (quoting *Mediterranean Enter., Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir. 1983)). Arbitration clauses that also cover disputes "concerning this agreement" are construed broadly. *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 764 (S.D.N.Y. 2013), appeal dismissed (Oct. 7, 2013).

Leonard Productions alleges that GTP breached the oral copromotional agreement obligating them jointly to execute the Exclusive Promotional Agreement, and breached fiduciary duties owed under the copromotional partnership. (Docket Entry No. 12). The primary dispute is whether the Exclusive Promotional Agreement should be interpreted and executed as Leonard Productions alleges, effectively treating it as a party to that Agreement. This dispute clearly concerns, and

appears to arise under, the Exclusive Promotional Agreement. The dispute is within the scope of the arbitration clause.

## IV.     Conclusion and Order

Goossen's and GTP's motion to dismiss for lack of personal jurisdiction is denied. (Docket Entry No. 5). This court finds no basis for applying issue preclusion against Leonard Productions. The defendants' motion to compel arbitration is granted. (Docket Entry No. 19). The motion for a preliminary injunction, (Docket Entry No. 3), the motion for a protective order, (Docket Entry No. 35, amended as Nos. 37 and 41), and the motion to compel production, (Docket Entry No. 42), are denied as moot.

Under section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, "a stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration . . . ." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). The Fifth Circuit has interpreted this language to mean only that the district court cannot deny a stay when one is properly requested. *Id.* "This rule, however, was not intended to limit dismissal of a case in the proper circumstances." *Id.* If all of the issues raised before the district court are arbitrable, dismissal of the case is appropriate. *Id.* As the Fifth Circuit explained in *Alford*:

> Although we understand that plaintiff's motion to compel arbitration must be granted, we do not believe that the proper course is to stay the action pending arbitration. Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose. Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law.

*Id.* (quoting *Sea-Land Service, Inc. v. Sea-Land of Puerto Rico, Inc.*, 636 F. Supp. 750, 757 (D. Puerto Rico 1986)).  No later than **September 26, 2014**, the parties are to file statements identifying reasons this case should not be dismissed in favor of arbitration.

SIGNED on September 16, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge